PHILLIPS (THOMPSON v.). See Case No. 13,974.

## Case No. 11,107.

PHILLIPS et al. v. The UNITED STATES.

[33 Hunt, Mer. Mag. 456.]

District Court, D. Connecticut. Nov. 23, 1854.

SALVAGE—WHAT ARE SALVAGE SERVICES—TOWAGE BY TUG—COMPENSATION.

[1. If the services of the tug in towing the vessel result in extricating her from a position of impending peril, the service is to be regarded as a salvage service, although the tug was summoned by a mere signal for towage, and not by a signal of distress.]

[2. Where a ship worth, with her cargo, some $60,000, after springing a leak, came to anchor in a storm at the Southwest Spit, above Sandy Hook, and was towed thence by two tugs into New York harbor, and run upon a mud bottom at the dock, the services being little more arduous than an ordinary towage, *held*, that $1,000 should be allowed.]

This libel is filed [by Isaac C. Phillips and others] to recover a salvage compensation for services rendered to the ship United States, by the steam tugs Hercules and Underwriter. The ship, worth from $10,000 to $15,000, and having on board a cargo of about a thousand tons of railroad iron, worth about $45,000, while bound into the port of New York, about 2 or 3 o'clock p. m. on the 11th of March, 1853, ran on outer middle shoal, about three miles from Sandy Hook. There were seventeen or eighteen feet of water on the shoal, and the ship, drawing about nineteen feet, was carried over the shoal by force of the sea and the wind, which was blowing a gale from the northeast. Soon after, she had a signal for a pilot, and was spoken by one, but the sea was so rough that he could not then board her. He therefore directed the captain of the ship to follow his boat, and he would lead him into deep water. This direction was followed till the ship arrived near the point of the Hook, when the pilot was enabled to board her, and she then proceeded under his direction as far as the Southwest Spit. She could then proceed no further up the harbor, as the wind was dead ahead.

When the pilot went on board, the ship, which was an old one, from thumping over the outer middle, was leaking badly, the necessary hands being at the pumps; and after her arrival at the Southwest Spit, the captain and the pilot consulted for her safety, and thereupon the pilot ordered a signal set forth for the steam tug Hercules, which, having that day towed down a schooner from New York, to lighten the ship Atlanta, which was ashore outside of the Hook, was then about two miles from the ship in the lower bay, looking for business in her ordinary occupation of towing vessels up and down the harbor. The evidence was contradictory as to whether the signal was an ordinary one for a tow, or a signal of distress. The Hercules came, in obedience to the signal, and took hold of the ship between 4 and 5 p. m., and the captain of the ship told the captain of the Hercules that the ship was leaking badly, and that the water was gaining on them. The Hercules not being able to tow her with as much dispatch as was desired, a signal was set from the ship for the Underwriter, which had also gone down in search of business. The Underwriter immediately obeyed the signal, and the two tugs brought the ship in safety up the harbor (although from the leak she settled one or two feet while coming up), and ran her upon a mud bottom in the Atlantic Dock, between 9 and 10 o'clock at night. This was on Friday, and by the following Wednesday she filled with water. The usual price paid to a steam tug for towing a vessel up from the lower bay varies from $25 to $100, according to the state of the weather and the difficulties of the case.

Cutting & Betts, for libellants.
Stoughton & Donohue, for claimants.

HELD BY THE COURT (INGERSOLL, District Judge): That the weight of evidence is that the signal set was not a signal of distress, but a signal for a tow. In obeying this signal, the tugs went to her aid, expecting and agreeing to engage in the business which the signal indicated. But, although the tugs started for the ship with the view to render a towage service merely, yet if the ship, when the tugs came to her assistance, was, in point of fact, in a condition where loss or serious damage was reasonably to be apprehended from her leaky condition, in connection with the boisterous state of the weather,—if she was encountering a threatened or impending peril, from which she was rescued by the tugs,—then, although the signal set by the ship was only one for a tow, and although when the tugs started for the ship, in obedience to the signal, they understood that they were wanted only for a towage service, they would be entitled to be compensated for a salvage service; for where a ship or its lading is saved from impending peril by the service of any persons, upon whom there is no obligation to render the service, then such service is to be compensated as a salvage service.

A mere towage service is confined to vessels which have received no damage which puts them in peril of loss. A mere towage compensation is payable in those cases only where the vessel receiving the service is in the same condition she would ordinarily be,

without having encountered any damage or accident. And if a towage engagement merely lead to the rescue of a ship from an imminent danger, it should be remunerated as salvage. 3 Hagg. Adm. 428.

That the court does not find as a fact that the ship and cargo would have been lost, or greatly damaged, if she had not been rescued by the tugs, but does find that there was danger of such loss, or great damage, and that the ship was rescued from that peril by the tugs, and the compensation which the libellants are entitled to receive for their services, must be a salvage compensation.

That there was but little, if any, more labor and peril incurred by the tugs than would have been incurred in such weather, in performing a towage service; that they manifested promptitude in obeying the signal, but were not diverted from their proper and usual employment, but were engaged in it; that the libellants have experienced but trifling injury or loss by the service which they have rendered, no more than probably would have been sustained if the ship had not by her leaky condition been exposed to impending peril, and that under all the circumstances the case demands only a moderate compensation.

Decree, therefore, that the libellants recover the sum of $1,000, to be divided equally between the two tugs.